**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**The Chillicothe Telephone Company**

    **Plaintiff,**

-V-　　　　　　　　　　　　　　　　　　Case No. 2:05-CV-00973
　　　　　　　　　　　　　　　　　　　　JUDGE SMITH
　　　　　　　　　　　　　　　　　　　　Magistrate Judge Abel

**The Variable Annuity Life**
**Insurance Company,** *et al.***,**

    **Defendants.**

## OPINION AND ORDER

Plaintiff The Chillicothe Telephone Company ("Plaintiff" or "CTC") brings this action seeking recovery of $5,482,867 paid to Defendants The Variable Annuity Life Insurance Company and Modern Woodmen of America (collectively "Defendants") in the course of a financing transaction between the parties. Defendants move to dismiss for failure to state a claim upon which relief can be granted (Doc. 15). Defendants have also filed a motion to add additional authority (Doc. 23). For the reasons that follow the Court **GRANTS** Defendants' Motion to Add Additional Authority (Doc. 23) and **GRANTS** Defendants' Motion to Dismiss (Doc. 15).

### I.  FACTS

Plaintiff CTC and Defendants are parties to two sets of note purchase agreements ("Note Agreements") and promissory notes ("Notes") by which Defendants loaned $42,000,000 to Plaintiff CTC. (*See* Compl. ¶¶ 8,12 and Exhibits A-D). The Note Agreements and Notes were entered into on August 1, 2002 and November 1, 2002. *See id.*

The Note Agreements contained covenants relating to Plaintiff CTC's net worth ("Net Worth Covenant") and total debt ("Total Debt Covenant"). With respect to the Net Worth Covenant, the Note Agreements provided that Plaintiff CTC would:

> . . . maintain Consolidated Adjusted Net Worth in an amount at least equal to $30,000,000, plus 25% of Consolidated Net Income, if any, determined on a cumulative basis for each fiscal year of the Company ending on or after December 31, 2002 and prior to the twelve-month period for which such determination is being made (without reduction for any Consolidated Net Loss incurred in any such fiscal year). (Compl. at ¶ 17).

With respect to the Total Debt Covenant, the Note Agreements provided "at the end of any fiscal quarter of the Company, Consolidated Total Debt [would not] exceed 60% of Consolidated Total Capitalization as of such fiscal quarter end." (Compl. at ¶ 18). Plaintiff CTC alleges that the intent of these net worth and total debt covenants was to ensure Defendants of the continuing ability of Plaintiff CTC to pay the principal and interest due on the Notes. (Compl. at ¶ 19).

If Plaintiff defaulted on the Net Worth or Total Debt Covenants, Defendants could, at "their option, by notice in writing to the [Plaintiff], declare the [Note Agreements] to be forthwith due and payable . . . together with interest accrued thereon and the premium specified in Section 2(a) . . . ." (Compl. Ex. A, Section 7). Section 2(a) sets forth the formula for determining the prepayment premium. (Compl. Ex. A, Section 2). Section 2(a) further allows for voluntary prepayment of the amounts due and owing under the Note Purchase Agreements at any point prior to maturity, but provides that in the event of voluntary prepayment, a prepayment

premium would be required. *Id*.

Plaintiff CTC made timely payments of principal and interest due on the notes through August, 2005. (*See* Compl. ¶ ¶ 11,15). In the summer of 2004, Plaintiff CTC provided notice to Defendants that Plaintiff's parent was contemplating a "going-private" transaction under the Securities Exchange Act of 1934. (Compl. at ¶ 20). In the fall of 2004, Plaintiff notified Defendants that it would have to pay its parent approximately $2.2 million to fund the going-private transaction. (Compl. at ¶29). Without amendment to the Note Agreements, the going-private transaction would have violated the Net Worth and Total Debt Covenants constituting an event of default under Section 7(f). (*See* Compl., Exs. A and C).

On December 15, 2004, Plaintiff and Defendants amended the Note Agreements ("First Amendments") in order to permit Plaintiff to fund the going-private transaction and still be in compliance with the Net Worth and the Total Debt Covenants. (Compl. at ¶ 32; Defs' Mot. to Dis. at 3). As amended, the Net Worth Covenant benchmark was lowered to $27,500,000 and the Total Debt Covenant percentage was raised such that the Consolidated Total Debt would not exceed 61% of Consolidated Total Capitalization.

In April, 2005, Plaintiff's parent completed the going-private transaction. (Compl. at ¶ 24). The cost to Plaintiff of the going-private transaction was over $5 million, more than twice Plaintiff's initial estimate. (Compl. at ¶ 34). Following the going-private transaction, Plaintiff notified Defendants of the increased costs and of the violation of the Net Worth and Total Debt Covenants notwithstanding the modifications in the First Amendments. (Compl. at ¶¶ 37-38). Plaintiff alleges it then requested further modifications to the Note Agreements, but that Defendants denied this request. (Compl. at ¶ 39-40). Plaintiff further alleges Defendants demanded that Plaintiff obtain new financing to pay off the principal balance on the notes as well

as the amount designated in the Note Agreements as a "prepayment premium." (Compl. at ¶ 40). Plaintiff alleges that in response to Defendants' demand, it offered to pay down some of the principal amounts due on the Notes to cure the violation of the Net Worth and Total Debt Covenants, but that Defendants refused this request. (*See* Compl. at ¶ 42).

In July, 2005, Plaintiff obtained replacement financing and on August 29, 2005, it tendered to Defendants the principal and interest due and owing under the promissory notes, but did not include any prepayment premium. (Compl. at ¶ 45). Defendants rejected the August 29, 2005 payment because of Plaintiff's failure to include payment for the prepayment premium. (Compl. at ¶ 45).

On September 1, 2005, Plaintiff tendered to Defendants the principal, interest due and the prepayment premium. (Compl. at ¶ 46). Plaintiff alleges that its payment of the prepayment premium was under protest and subject to a reservation of rights including the rights asserted in this lawsuit. (Compl. at ¶ 46; Pl's Reply at 5).

On September 30, 2005, Plaintiff filed a Complaint in the Court of Common Pleas, Ross County, Ohio. Defendants removed this action to the Court on October 25, 2005. Plaintiff seeks recovery of the prepayment premium and asserts four causes of action against Defendants including: (1) improper penalty; (2) breach of contract; (3) breach of the duty of good faith and fair dealing; and (4) improper acceleration. Defendants have filed a motion to dismiss seeking dismissal of all claims.

## II. MOTION TO DISMISS STANDARD

A motion to dismiss for failure to state a claim should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle

him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). All well-pleaded allegations must be taken as true and be construed most favorably toward the nonmoving party. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). A 12(b)(6) motion to dismiss is directed solely to the complaint and any exhibits attached to it. *Roth Steel Prods. v. Sharon Steel Corp.*, 705 F.2d 134, 155 (6th Cir. 1983). The merits of the claims set forth in the complaint are not at issue on a motion to dismiss for failure to state a claim. Consequently, a complaint will be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) only if there is no law to support the claims made, or if the facts alleged are insufficient to state a claim, or if on the face of the complaint there is an insurmountable bar to relief. *Rauch v. Day & Night Mfg. Corp.*, 576 F.2d 697, 702 (6th Cir. 1978). Rule 12 (b)(6) must be read in conjunction with Fed. R. Civ. P. 8(a) which provides that a pleading for relief shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief." 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356, at 296 (2d ed.1990). The moving party is entitled to relief only when the complaint fails to meet this liberal standard. *Id.*

On the other hand, more than bare assertions of legal conclusions are required to satisfy the notice pleading standard. *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988). "In practice, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory." *Id.* at 437. (Quotes omitted).

> [W]e are not holding the pleader to an impossibly high standard; we recognize the policies behind rule 8 and the concept of notice pleading. A plaintiff will not be thrown out of court for failing to plead facts in support of every arcane element of his claim. But when a complaint omits facts that, if they existed, would clearly dominate the case, it seems fair to assume that those facts do not exist.

*Id.*

### III. DISCUSSION

5

As a preliminary matter, this Court grants Defendants' pending Motion to Add Additional Authority (Doc. 23). The Court will now review each of the Complaint's four counts and address Defendants' corresponding arguments for dismissal in the order in which the counts appear in Plaintiff's Complaint.

**A.      Improper Penalty (Count 1)**

In Count one, Plaintiff CTC seeks return of the prepayment premium paid to Defendant and alleges that the prepayment premium is an improper penalty. Specifically, Plaintiff alleges: "[t]he prepayment premium demanded by Defendants is unreasonable, manifestly unconscionable, inequitable, unrealistic and disproportionate in amount, and an improper and unenforceable penalty." (Compl. at ¶ 48). The Court rejects Plaintiff's conclusory allegations of unconscionability.

As set forth by the Sixth Circuit, the "clear purpose" of a prepayment premium "is to compensate the lender for the risk that market rates of interest at the time of prepayment might be lower than the rate of the loan being prepaid." *U.S. v. Harris*, 246 F.3d 566, 573 (6th Cir. 2001) (citations omitted); *see also*, *Northwest Bank Minn. v. Blair Road Associates, L.P.*, 252 F.Supp.2d 86, 97 (D. N.J. 2003) (describing a "prepayment penalty" identical to those in the present case as "common practice in a competitive industry"). The *Harris* Court held that prepayment premiums "will be allowed if the parties expressly bargained for the premiums" whether or not the prepayment was "voluntary or involuntary." *See id*. at 572. Similarly, the Ohio appellate court in *Bay Coast Properties, Inc. v. National City Bank*, 2006 WL 1305110 (Ohio App. 6 Dist), held that "the express terms of the promissory note required that [borrower] pay a prepayment premium when it prepaid the remaining principal while the fixed loan rate remained in effect. [The lender], in collecting the premium, did not breach the promissory note;

it merely enforced its rights under the contract." *Id*. at *5. Like the *Harris* and *Bay Coast Properties* courts, the United States Bankruptcy Court for the Southern District of Ohio upheld the enforceability of a prepayment premium in *In re Hidden Lake Limited Partnership*, 247 B.R. 722 (Bankr. S.D. Ohio 2000). In upholding the prepayment clause, the *Hidden Lake* court noted that the parties involved were "knowledgeable, had a reasonable chance to understand the terms of the agreement and were sufficiently sophisticated and experienced to be aware of the import of the agreement." *Id*. at 729.[1]

In the present case, the Court finds that Plaintiff's allegations that the prepayment premium term was "manifestly unconscionable, inequitable, unrealistic and disproportionate in amount, and an improper and unenforceable penalty" are nothing more than bare assertions of legal conclusions insufficient to satisfy the notice pleading standard. *See*, *Scheid*, 859 F.2d 436-437. Plaintiff has failed to allege any facts to support its claim for improper penalty. Plaintiff has not alleged that it did not expressly bargain for the prepayment premium and no allegation by Plaintiff questions the process by which these documents between sophisticated commercial entities, represented by counsel, came to be negotiated and executed. (*See* Compl. Ex. E-2, Form Opinion of Purchasers' Special Counsel, a written legal opinion of the transaction by law firm of Porter Wright Morris & Arthur). Instead, Plaintiff, in its Memorandum in Opposition, argues that the allegation asserting that Plaintiff "did not voluntarily prepay the notes, but instead was forced by Defendants to obtain refinancing and to pay the prepayment premium" would "establish that enforcement of the prepayment premium under the circumstances would be

---

[1] The *Hidden Lake* court, in reaching its conclusion, acknowledged that use of the Treasury obligation as a reference point for the calculation (as the parties have in the present case) was reasonable. *Id*.

7

inequitable, unconscionable and unreasonable." (Pl's Memo. in Opp. at 9).

The Court finds that this allegation is insufficient to sustain Count one for two reasons. *First*, Plaintiff's allegation that it was "forced" to make the prepayment, like its allegations that the prepayment premium is unconscionable, is conclusory and Plaintiff has failed to allege any facts supporting this assertion.[2]  *Second*, Plaintiff's argument ignores the holding of *Harris*, that prepayment premiums "will be allowed if the parties expressly bargained for the premiums" whether or not the prepayment was "voluntary or involuntary."

Accordingly, Count one of the Complaint is dismissed with prejudice.

---

[2]Further, Plaintiff's argument that it was "forced" to refinance and make prepayment is refuted by (1) the plain language of the Note Agreements which does not grant Defendants the ability to "demand" refinancing; and (2) Plaintiff's admissions that Defendants did not accelerate by declaring actual default and demanding payment in writing as required by Section 7 of the Note Purchase Agreements. (*See* Pl's Memo. in Opp. at 1, 5; Pl's Memo. in Opp. to Def's Mot. to Add Add'l Authority at 1-2).  Moreover, if Plaintiff did not obtain refinancing, Section 7 of the Note Agreements gave Defendants the right to accelerate the amounts due and owing (due to the violations of the Net Worth and Total Debt Covenants), but Defendants did not do this because as Plaintiff admits, it "obtained replacement financing." *See* Compl. at ¶ 45.

B.   **Breach of Note Purchase Agreement (Count 2) and Breach of the Duty of Good Faith and Fair Dealing (Count 3)**

The Court addresses Counts two and three of the Complaint together because the allegations underlying both Counts are the same.

In Count two, Plaintiff asserts that Defendants' "conduct of insisting Plaintiff obtain refinancing and Defendants' refusal of Plaintiff's tender of principal and interest without the prepayment premium, constituted a breach of the Note Agreements. (*See* Compl. at ¶¶ 51-53). In Count three, Plaintiff alleges that Defendants' demand that Plaintiff repay in full the principal and interest due on the Note Agreements and Defendants' refusal to accept a partial pay-down of the principal amounts were "commercially unjustified, unreasonable, designed to take opportunistic advantage . . . and made in bad faith to force payment of the prepayment premium in a manner not contemplated by the parties . . . ." (Compl. at ¶ 57). Plaintiff further alleges that Defendants were "dishonest in fact" in their dealings with Plaintiff by "falsely claim[ing] to be concerned about [Plaintiff's] ability to pay the principal and interest due on the Notes. (Compl. at ¶¶ 43, 58). Defendant argues that Plaintiff has failed to satisfy the minimal elements necessary to sustain its claims in Counts two and three. (Def's Reply at p. 6). This Court agrees.

Though Ohio courts recognize an implied duty of good faith and fair dealing inherent in every contract, "Ohio law is crystal clear that an actor does not act in 'bad faith' when it decides to enforce its contractual rights [and a] party may even enforce contractual rights to the 'great discomfort' of the other party without violating its duty of good faith." *Oak Ruber Co. v. Bank One, N.A.*, 214 F.Supp.2d 820 (N.D. Ohio 2002). *See also*, *Needham v. Provident Bank*, 675 N.E.2d 514, 523 (Cuyahoga Cty. 1996) ("Ohio courts . . . uniformly . . . find that a lender does not act in 'bad faith' when it decides to enforce its contractual rights.") (citations omitted).

In *Needham*, the Ohio appellate court affirmed the trial court's decision that a lender had not reached its duty of good faith and fair dealing when it requested that the plaintiff borrower obtain refinancing on an outstanding line of credit and loan that the plaintiffs had personally guaranteed. *Id*. at 519. The *Needham* court stated:

> Firms that have negotiated contracts are entitled to enforce them, even to the great discomfort of their trading partners, without being mulcted for lack of 'good faith.' Although courts often refer to the obligation of good faith that exists in every contract relation, this is not an open invitation to decide whether one party ought to have exercised privileges expressly reserved in the document. 'Good faith' is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of the drafting, and which therefore was not explicitly resolved by the parties.

*Id*. at 524 (citations omitted).

In *Oak Rubber*, the lender threatened to enforce its rights as a secured creditor against the borrower, event though the creditor knew that it had previously given up its rights as a csecured creditor in a prior modification agreement with the borrower. *See Oak Rubber*, 214 F.Supp.2d at 833. Despite the fact that the lender knowingly misrepresented its position to the borrower, the court declined to hold that the lender violated its duty of good faith, finding that "[e]ven in looking at the facts in the light most favorable to Oak Rubber, Bank One's actions do not demonstrate an attempt to take 'opportunistic advantage' of Oak Rubber 'in a way that could not have been contemplated at the time of drafting.'"

In the present case, the Note Purchase Agreements give Defendants the bargained-for right to the prepayment premiums upon prepayment by Plaintiff. (*See* Compl., Exs. A and C § 2(a)). As stated earlier, this Court rejects Plaintiff's conclusory allegations that its prepayment was involuntary or that it was "forced" to make prepayment. (*See infra* at III.A., fn. 2). Thus, the plain language of the Note Agreements entitled Defendants to collect the prepayment premiums

10

and therefore such actions did not breach the Note Agreements.

Accordingly, Counts two and three of the Complaint are dismissed with prejudice.

C.    **Breach of O.R.C. § 1301.14 (Count 4)**

In Count four, titled "Improper Acceleration," Plaintiff alleges that Defendants' demand for payment on the Notes violated O.R.C. §1301.14. (Compl. at ¶¶ 63-64). That section of the Ohio Revised Code states:

> a [contract] term providing that one party or his successor in interest "may accelerate payment or performance . . . 'at will' or 'when he deems himself insecure' or in words of similar import shall be construed to mean that he shall have power to do [so] only if he in good faith believes that the prospect of payment or performance is impaired."

Defendants argue that this section is inapplicable because Defendants never accelerated in the first instance. This Court agrees.

Plaintiff relies on *Needham v. The Provident Bank*, 675 N.E.2d 514 (Franklin Cty. 1996), to support its position that Defendants' alleged demand[3] for payment on the Notes amounts to an acceleration. Defendants also cite *Needham* as supportive of its position that O.R.C. § 1301.14 is inapplicable and argues Plaintiff's interpretation of *Needham* represents a disingenuous misreading of a straightforward holding. (Def's Reply at 9). Again, this Court agrees with Defendants.

In *Needham*, the lender-defendant repeatedly "directed [borrower-plaintiff] to seek alternative financing." *Id*. at 519, 524. The *Needham* borrower-plaintiff alleged improper

---

[3]Though Plaintiff does not reveal the details of this alleged demand, other portions of Plaintiff's Memorandum in Opposition make clear that Plaintiff did not receive a written notice of default demanding payment from Defendant. (*See* Pl's Memo. in Opp. at 1, 5).

11

acceleration. *Id*. at 519-520. The *Needham* court found that these statements did not amount to the lender-defendant taking action to accelerate payment against the borrower-plaintiff. *See id*. at 523-525. Consequently, the *Needham* court found that O.R.C. § 1301.14, the statute which requires good faith in the acceleration of payment or performance, was irrelevant. *See id*. at 523-525.

In the present case, Section 7 of the Note Purchase Agreements provides that Defendants may accelerate upon default "by notice in writing to [Plaintiff] . . . declar[ing] the Note or all of the Notes, as the case may be, to be forthwith and due and payable . . . together with interest accrued thereon and the [prepayment] premium specified in Section 2(a) . . . ." Though Plaintiff has admitted it defaulted on the Net Worth and Total Debt Covenants, Plaintiff has not alleged that Defendants provided it with written notice of default. In fact, Plaintiff has made it clear that Defendants did not accelerate by declaring actual default and demanding payment in writing as required by Section 7 of the Note Purchase Agreements. (*See* Pl's Memo. in Opp. at 1, 5; Pl's Memo. in Opp. to Def's Mot. to Add Add'l Authority at 1-2). Thus, Defendants, like the lender-defendant in *Needham*, have not accelerated the amounts owed under the Note Purchase Agreements, and consequently, O.R.C. §1301.14 is irrelevant.

Accordingly, Count four of the Complaint is dismissed with prejudice.

## V. CONCLUSION

Based on the above, the Court **GRANTS** Defendants Motion to Add Additional Authority (Doc. 23) and **GRANTS** Defendants' Motion to Dismiss (Doc. 15).

The Clerk shall enter a final judgment in this case, dismissing all Plaintiff's claims with prejudice.

The Clerk shall remove Documents 15 and 23 from the Court's pending motions list.

      The Clerk shall remove this case from the Court's pending cases.

      **IT IS SO ORDERED.**

        **s/ George C. Smith**
      **GEORGE C. SMITH, JUDGE**
      **UNITED STATES DISTRICT COURT**